IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN L. CORBIN, | ) | CASE NO. 1:12-cv-02419 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff John L. Corbin ("Plaintiff" or "Corbin") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").

Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been

referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to

Local Rule 72.2(b)(1).

For the reasons stated below, the Commissioner's decision should be **AFFIRMED**.

## I.  Procedural History

On October 23, 2007, Corbin filed his applications for DIB and SSI.  Tr. 66-69, 112-19,

120-22.  Corbin alleged a disability onset date of August 15, 2007.  Tr. 112, 120.  Corbin alleged

disability based on hepatitis C, peripheral neuropathy, back problems, foot problems, personality

disorders, right eye pain, nausea, fatigue, depression,[2] and loss of appetite.  Tr. 66-69, 70, 74, 82,

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R.
CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

[2] Corbin first raised depression as a basis for his disability at the reconsideration level.  Tr. 86-88, 89-92, 93-95, 196,
485.

86, 89, 93.  After initial denial by the state agency (Tr. 70-73, 74-76) and denial upon
reconsideration (Tr. 82-85, 86-88, 89-92, 93-95), Corbin requested a hearing (Tr. 96).  An
administrative hearing was held before Administrative Law Judge Traci M. Hixson ("ALJ") on
July 22, 2010.  Tr. 30-65.

In her April 7, 2011, decision, the ALJ determined that Corbin had not been under a
disability from August 15, 2007, through the date of the ALJ's decision.  Tr. 12-29.  Corbin
requested review of the ALJ's decision by the Appeals Council.  Tr. 109.  On July 24, 2012, the
Appeals Council denied Corbin's request for review, making the ALJ's decision the final
decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.      Personal and vocational evidence

Corbin was born on March 16, 1958.  Tr. 33.  According to his testimony, he has a
common law wife and one adult child.  Tr. 33.  Corbin resides with his wife and their grandson
in a single family home that they own.  Tr. 33-34, 36, 50.  Corbin and his wife are raising their
grandson.  Tr. 34.  Corbin attended public school through the ninth grade.  Tr. 34.  While
incarcerated, Corbin passed the GED but, because the instructor was not authorized to administer
the test, his GED was disputed.  Tr. 34.   Corbin last worked in 2007 at a company called
Ferrotherm.  Tr. 41.  While employed at Ferrotherm, Corbin made small parts for entities like
NASA and Boeing.  Tr. 41.  His job required him to be on his feet and hold pieces to a grinder.
Tr. 41.  Eventually, his feet hurt and the job became difficult for him.  Tr. 41.  As a result, he
was unable to perform his job without messing up the product and the company fired him in July
2007.  Tr. 41-42.

**B.      Medical and opinion evidence[3]**

    **1.      Treating physicians**

        **a.      Kevin D. Mullen, M.D.**

On January 24, 2007, pursuant to a referral by Dr. Nimish Thakore, a neurologist, Corbin saw Kevin D. Mullen, M.D., for a consultation regarding hepatitis C and cryoglobulinemia.  Tr. 415.  Dr. Mullen recommended that Corbin try to start Interferon treatment for his hepatitis C.  Tr. 416.  Later, in 2008, Corbin started the Interferon treatment, which lasted almost one year.  Tr. 524, 581, 613.

On January 24, 2008, Dr. Mullen provided a "To whom it may concern" letter wherein he stated that Corbin was "undergoing major medical therapy at present.  It is causing devastating side effects.  Therefore, the patient is totally disabled until further notice."  Tr. 659.

        **b.      Pouya Bina, M.D.**

Corbin first saw Pouya Bina, M.D., on October 16, 2007, for the purpose of establishing a new primary care physician.  Tr. 422.  Corbin reported to Dr. Bina that he was due to start his Interferon treatment through the liver clinic.  Tr. 424.  Dr. Bina recommended that Corbin start on Neurontin for his foot pain/polyneuropathy.  Tr. 424.  Dr. Bina noted that Corbin's foot pain was likely secondary to his polyneuropathy and was likely related to his hepatitis C.  Tr. 424-25.  Thus, Dr. Bina indicated that Corbin's foot pain might improve with the hepatitis C treatment.  Tr. 424-25.

On December 9, 2008, after Corbin requested a letter stating that he was unable to care for his grandson so that he could qualify for child care benefits, Dr. Bina provided a "To whom it may concern" letter. Tr. 608, 610.  In that letter, Dr. Bina stated:

---

[3] Since Corbin does not base his arguments raised herein on his asthma, it is not necessary for the Court to address the medical evidence pertaining to his asthma.

> I have been Mr. John Corbin's primary medical provider at MetroHealth Medical
> Center since 2007.  He suffers from axonal polyneuropathy in his lower
> extremities, confirmed with EMG studies performed in 2006, he is currently being
> treated for this condition, however, continues to suffer from chronic and disabling
> pain which renders him unable to care for Mark Beaty.

Tr. 608.

### 2.        Consultative physician

On April 2, 2008, Mitchell Wax, Ph.D., conducted a consultative examination and

provided his opinion regarding Corbin's mental state.  Tr. 479.   Corbin reported taking Zoloft at

the time of the examination.  Tr. 479.  He reported having no prior psychiatric care or

hospitalizations.  Tr. 479.  Although he did not have a driver's license, Corbin reported to Dr.

Wax that he had driven himself to the examination; he indicated that he could not take public

transportation because it was too painful for him to walk to the bus.  Tr. 479-80.  Corbin reported

being fired from most of his jobs for not getting along with supervisors or coworkers.  Tr. 480,

482.  Corbin reported that he was impulsive and indicated that "he gets angry quickly, and that

he is hateful and spiteful" and compulsive.  Tr. 480.  Corbin blamed Zoloft for making him

angry.  Tr. 481.  Corbin reported having crying spells and feelings of apprehension, fear and

worry.  Tr. 480-81.  However, he did not cry nor did he appear anxious or fretful during the

examination.  Tr. 480-81.  Corbin indicated that he had difficulty concentrating.  Tr. 481, 482.

Dr. Wax indicated that Corbin "presented as emotionally labile, going from angry to anxious to

sad and finally at the end of the evaluation appearing content."  Tr. 481.  Dr. Wax also indicated

that Corbin did not understand the extent of his problems and had not sought mental health

treatment.  Tr. 481.

Dr. Wax diagnosed Corbin as having bipolar disorder; intermittent explosive disorder;

and personality disorder with antisocial features.  Tr. 483.  Dr. Wax assessed Corbin with a GAF

functioning score of 31 and a GAF symptoms score of 40.[4]  Tr. 484.  Dr. Wax opined that

Corbin's (1) ability to understand, remember, and follow instructions was moderately impaired;

(2) ability to maintain attention, concentration, and persistence was markedly impaired, while his

pace was normal; and (3) ability to withstand the stresses and pressures associated with day to

day work activity was markedly impaired.  Tr. 483.

### 3.      Reviewing physician

State agency reviewing physician Catherine Flynn, Psy.D., completed two Mental RFCs

and Psychiatric Review Techniques.  Tr. 488-505, 560-78.

On May 20, 2008, Dr. Flynn completed the first Mental RFC and Psychiatric Review

Technique.  Tr. 488-505.  In the May 20, 2008, Mental RFC, Dr. Flynn gave weight to Dr.

Wax's opinion that Corbin was markedly impaired in his ability to handle daily work stress and

in his ability to maintain attention, concentration and persistence.  Tr. 504.  Dr. Flynn also

indicated that Corbin's allegations appeared credible.  Tr. 504.

On July 5, 2008, Dr. Flynn completed a second Mental RFC and Psychiatric Review

Technique.  Tr. 560-78.   In issuing the new Mental RFC and Psychiatric Review Technique, Dr.

Flynn stated that she was "in total agreement with Dr. Richardson's[5] QA return on this claim and

---

[4] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *Id.*

[5] On May 30, 2008, Dr. Deryck Richardson, Ph.D., completed a "QA Case Analysis" wherein he provided his recommendations as to additional steps that should be taken to address some inconsistencies/conflicts in the record and to assess severity and duration.  Tr. 506-07.

. . . [she] regret[ted] not having pushed harder for more information after . . . [her] first failed attempt."[6]  Tr. 578; *See also* Tr. 197, 506-07.

In her July 5, 2008, Mental RFC, Dr. Flynn noted that she had received Corbin's records from prison as well as records from his MetroHealth attending physician and information from Corbin's former supervisor regarding the reasons for Corbin's termination.  Tr. 576.  Dr. Flynn noted that Corbin's prison records revealed no psychiatric treatment.[7]  Tr. 576.  She noted that Corbin's Metrohealth records through June 23, 2008, reflected that Corbin had a good understanding of his care; mental depression and suicidal ideation were denied; and his judgment, memory and cognition were grossly intact.  Tr. 576.  Dr. Flynn noted that Corbin's former supervisor had indicated that Corbin had been terminated for the quality of his work and denied that Corbin had exhibited significant behavioral problems.  Tr. 576.  Dr. Flynn also considered information from Corbin's wife, including her statements that Corbin worked on cars for people and took care of the grandchildren while she was at work and that Corbin had recently become more irritable and his pace and concentration were diminished.  Tr. 576.

Dr. Flynn concluded that the evidence did not entirely support Corbin's allegations and undermined the credibility of his allegations.  Tr. 576.  Dr. Flynn also concluded that Dr. Wax's opinions regarding Corbin's functional abilities were not supported by her investigation of Corbin's reports.  Tr. 576.  For example, Dr. Flynn noted that Corbin's former employer did not back up Corbin's claim of violence in the workplace.  Tr. 576.  Accordingly, Dr. Flynn did not accept Dr. Wax's opinions.  Tr. 576.  Rather, Dr. Flynn opined that Corbin "can process complex

---

[6] Dr. Flynn does not state specifically what additional information she regretted not having pushed harder for.  Tr. 578.  However, on May 5, 2008, Dr. Flynn had requested a report from Corbin's supervisor at the job he was fired from in July 2007, and Dr. Flynn also indicated that she was "[n]ot ready to sign an allowance on this person without more information."  Tr. 486.

[7] When Corbin was in prison, psychological assessments and tests were performed.  Tr. 235-85.  However, there was no psychiatric referral.  Tr. 235, 237.

interactions.  He will do best with activities which minimixe [sic] prolonged social exposure such as his current reported activities with work on cars.  No other significant psych limitations documented."  Tr. 576.

**C.     Testimonial Evidence**

**1.      Plaintiff's Testimony**

Plaintiff was represented by counsel and testified at the administrative hearing on various matters, including his daily activities, work history, and physical and mental impairment claims.  Tr. 33-55, 56-58.  He indicated that, because his wife works, to the extent he is able to do so, he helps with chores around the house and cooking.  Tr. 35-36, 39-40.  Because of the pain in his feet, it is difficult for him to go up and down the stairs.  Tr. 36.  He keeps a cot in the dining room on the first floor so he can rest but he usually eventually makes it upstairs to his bed.  Tr. 36.  Corbin is unable to mow his lawn but he sometimes rakes or sweeps the sidewalk.  Tr. 37.  If his wife's car needs repairs, he might work on his wife's car as long as he is not on his feet for a long period of time.  Tr. 37-38.  Corbin enjoys spending time with his grandson.  Tr. 38.  Although Corbin's grandson would prefer to engage in more active play, he understands Corbin's limitations so they often play board games.  Tr. 38.  Corbin watches television but does not read very often.  Tr. 38.  He indicated that his level of comprehension is not very good.  Tr. 38.  He really enjoys fishing and has fished with his grandson but, during their last fishing trip, they were stuck in the rain because the nearest place to seek cover was too far away for Corbin to get to.  Tr. 39.  Family and friends visit with Corbin at his house.  Tr. 39.

Corbin indicated that he can lift about 30 or 40 pounds but would only be able to carry something about 10 feet and he would be in pain afterwards.  Tr. 46.  For example, Corbin indicated that lifting a basket of clothes and trying to get them up the stairs is a chore for him.

Tr. 46.  He sometimes has to stop and sit down on the landing and wait until his feet are feeling better before he can continue.  Tr. 46.  Corbin indicated that he has lost some of his strength.  Tr. 47.  He does not have trouble reaching for things but has noticed that he has been losing his balance more frequently.  Tr. 47-48.  Even when sitting, he still has pain in his feet.  Tr. 51. Corbin experiences a little less pain if he takes his shoes off and keeps his legs stretched out.  Tr. 51-52.  Although his doctors have not prescribed a cane, Corbin occasionally uses a makeshift cane to help him maintain his stability.  Tr. 48.  In 2009, Corbin obtained a disability placard for his car.  Tr. 52, 225.  He indicated that it was his wife's idea but he is now glad that he has it because he would not be able to walk from the car to a store and then around the store.  Tr. 52.

Corbin testified about the Interferon treatment that he received for his hepatitis C.  Tr. 44. He started the treatment in 2008 and it lasted about a year.  Tr. 44-45, 52-53.  The treatment was very rough on Corbin.  Tr. 44.  Although the treatment seemed to help him physically, it caused physical side effects, including nausea, fatigue, pain, and headaches, and it impacted his mental health.  Tr. 44, 53.  He was depressed and irritable, locked himself up in his house, and did not want anything to do with anyone.  Tr. 44-45, 53-55.  The treatment was so difficult on him and he was so irritable that, although his wife continued to check on him, his wife and their grandson stayed with his wife's sister a couple of times.  Tr. 53.  Corbin indicated that things get on his nerves more often than in the past and he cries even at the littlest thing.  Tr. 49.  He has a difficult time concentrating and focusing and worries all the time.  Tr. 50.  He stated that he has never been a violent person but has become a very verbally violent person and, as a result of his increased anger and irritability, he feels a few friends have stopped visiting him.[8]  Tr. 53-54.  At

---

[8] Based on a criminal history that includes convictions for armed robbery, vehicular homicide, aggravated assault and felonious assault, the ALJ questioned Corbin about his statement that he has never been a violent person.  Tr. 54-55.  Corbin acknowledged his criminal history and indicated that his criminal past was due in large part to his use of alcohol.  Tr. 55.  He stated during the hearing that he stopped using alcohol in July of 2001 after he had caused

8

the time of the administrative hearing in 2010, Corbin was still feeling depressed.  Tr. 45.  He

was not taking any medication for his depression because he did not have medical coverage.  Tr.

45.  He had been prescribed Zoloft in the past but indicated that it did not help at all.  Tr. 49-50.

### 2.     Vocational Expert's Testimony

Vocational Expert Thomas Nimberger ("VE") testified at the hearing.  Tr. 55-56, 58-64.

The VE described Corbin's work over the prior 15 years.  Tr. 56, 58-59.   The VE indicated that

Corbin had worked as a metal fabricator, which was a heavy, skilled position that Corbin

performed at the very heavy level at times.  Tr. 58.  The VE also indicated that Corbin had

worked as a bench grinder standing at a machine, which was a medium, semi-skilled position

that Corbin performed at the medium level. Tr. 58-59.  The VE also indicated that Corbin had

performed sand blasting and general deburring, which was a medium, unskilled position that

Corbin performed at the light level at times.  Tr. 59.

The ALJ asked the VE to assume a person of the same age, education and employment

background as Corbin who could lift and carry 20 pounds occasionally and 10 pounds

frequently; could stand and walk for six hours and sit for six hours but would require a sit/stand

option every hour; could occasionally climb stairs and ramps; could bend and balance

occasionally; could stoop occasionally but could not kneel or crawl; could reach in all directions;

could handle, finger and feel; must avoid pulmonary irritants; and could occasionally push and

pull with lower extremities.  Tr. 59-60.   The VE indicated that such a hypothetical person

would be unable to perform Corbin's past work.  Tr. 60.  However, the VE indicated that such a

hypothetical individual would be able to perform other work in the regional or national economy,

including (1) cashier, a light unskilled job, with 1,800 positions available in northeast Ohio and

---

the death of a friend in a motor vehicle accident.  Tr. 55.  However, during Dr. Wax's consultative examination,
Corbin indicated that he last consumed alcohol on December 22, 2007.  Tr. 480.

310,000 positions available nationally; (2) mail clerk, a light unskilled job, with 980 positions available in northeast Ohio and 240,000 positions available nationally; and (3) electrical equipment assembler, a light unskilled job, with 790 positions available in northeast Ohio and 190,000 positions available nationally.  Tr. 60-61.

The ALJ then presented a second hypothetical to the VE with the same restrictions as the first hypothetical except the individual could only lift and carry 10 pounds occasionally; could stand and walk for two hours and sit for six hours; and would require a sit/stand option every hour.  Tr. 61.  The VE indicated that such a hypothetical individual would be able to perform other work in the regional or national economy, including (1) order clerk, a sedentary unskilled job with 850 positions available in northeast Ohio and 220,000 positions available nationally; (2) sorter, a sedentary job with 740 positions available in northeast Ohio and 180,000 positions available nationally; and (3) a front desk receptionist, a sedentary unskilled job, with 790 positions available in northeast Ohio and 190,000 positions available nationally.  Tr. 61-62.

The ALJ asked the VE whether a requirement that the individual elevate his leg below waist level would impact the VE's testimony regarding available jobs under either of the two hypotheticals.  Tr. 62.  The VE indicated that a need for just footstool elevation would not make a difference but, if the individual had to elevate his leg at waist level, the stated jobs would be unavailable to such an individual.  Tr. 62.

During his testimony, the VE also indicated that, given Corbin's criminal background and the level of background checks taking place today in the employment context, getting a job would be difficult.  Tr. 61-62, 63-64.  The VE also stated that, if someone was off task 15% of the workday, he may be able to obtain employment but would eventually be fired from the position.  Tr. 64.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

11

20 C.F.R. §§ 404.1520, 416.920;[9] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her April 7, 2011, decision, the ALJ made the following findings:

1.     Corbin met the insured status requirements through December 31, 2012. Tr. 17.

2.     Corbin had not engaged in substantial gainful activity since August 15, 2007.  Tr. 17.

3.     Corbin had the following severe impairments: hepatitis C, lower extremity polyneuropathy, and asthma.  Tr. 17.  Corbin's depression was a non-severe impairment.  Tr. 17-18.

4.     Corbin did not have an impairment or combination of impairments that met or medically equaled a listed impairment.[10]  Tr. 18.

5.     Corbin had the RFC to perform less than a full range of light work as he could occasionally push/pull with lower extremities; he could stand, walk, or sit for 6 hours per work day but must have a sit/stand option available each hour; he could occasionally climb ramps or stairs; he could bend, balance, and stoop occasionally, but could not kneel or crawl; he could reach in all directions; he could handle, finger, and feel; and was restricted from exposure to pulmonary irritants. Tr. 18-21.

---

[9] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[10] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

6.      Corbin was unable to perform any past relevant work.  Tr. 21.

7.      Corbin was born on March 16, 1958, and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Corbin subsequently changed age category to closely approaching advanced age. Tr. 21.

8.      Corbin had at least a high school education and could communicate in English.  Tr. 22.

9.      Transferability of job skills was not material to the determination of disability.  Tr. 22.

10.     Considering Corbin's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Corbin could perform, including cashier, mail clerk, and order clerk.  Tr. 22-23.

Based on the foregoing, the ALJ determined that Corbin had not been under a disability from August 15, 2007, through the date of the decision.  Tr. 23.

## V. Parties' Arguments

### A.      Plaintiff's Arguments

Plaintiff presents four arguments in support of his request for reversal and remand.

First, he asserts that the ALJ failed to adhere to the treating physician rule because the ALJ neither discussed nor assigned weight to the opinion of Corbin's treating physician, Pouya Bina, M.D.  Doc. 15, pp. 11-13; Doc. 17, pp. 1-4.

Second, Corbin argues that the ALJ erred by not explaining the weight she gave to the July 5, 2008, opinion of state agency reviewing physician Catherine Flynn, Psy. D.[11]  Doc. 15, pp. 13-15; Doc. 17, pp. 4-5.

---

[11] Plaintiff first argued that the ALJ erred because she failed to discuss the weight given to Dr. Mitchell Wax, Ph.D., and Dr. Catherine Flynn, Psy.D.  Doc. 15, p. 14.  However, in his Reply Brief, Plaintiff concedes that the ALJ explained the weight assigned to Dr. Wax's April 2, 2008, assessment and Dr. Flynn's May 20, 2008, assessment and clarified that he was challenging the ALJ's treatment of Dr. Flynn's July 5, 2008, revised opinion only.  Doc. 17, p. 4.

Third, Corbin argues that the ALJ erred when she concluded that Corbin's depression, bipolar disorder, and intermittent explosive disorder were non-severe impairments at Step Two and when the ALJ failed to account for his non-exertional psychological impairments at later Steps in the sequential evaluation.  Doc. 15, pp. 16-17; Doc. 17, pp. 5-6.

Fourth, Corbin argues that the ALJ did not conduct a meaningful review of whether Corbin's polyneuropathy met or medically equaled Listing 11.14 (*Peripheral Neuropathies*).[12] Doc. 15, pp. 18-21; Doc. 17, pp. 6-7.  Thus, Corbin argues that the ALJ's Step Three finding was not supported by substantial evidence.[13]  Doc. 15, pp. 18-21; Doc. 17, pp. 6-7.

## B.    Defendant's Arguments

In response to Corbin's first argument, the Commissioner asserts that the ALJ did not err in her treatment of Dr. Bina's December 9, 2008, opinion.  Doc. 16, pp. 11-13.  First, the Commissioner argues that the December 9, 2008, opinion was prepared for the purpose of assisting Corbin with obtaining childcare benefits and was not an opinion regarding Corbin's ability to perform substantial gainful activity ("SGA").  Doc. 16, p. 11.  Second, the Commissioner argues that, to the extent that the December 9, 2008, opinion could be considered an opinion as to disability, the opinion was not entitled to deference because the issue of disability is a legal, not a medical, determination that is reserved to the Commissioner.  Doc. 16,

---

[12] Listing 11.14 requires a showing of peripheral neuropathies "with disorganization of motor function as described in section 11.04B, in spite of prescribed treatment." 20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 11.14.  Section 11.04B describes disorganization of motor function as "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C). 20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 11.04B.

[13] In a footnote, Corbin asserts that he "also likely met or medically equaled the requirements of Listing 12.04 per the psychiatric evaluations of SSA's own doctors that the ALJ improperly ignored, as discussed *supra* at 13-15." Doc. 15, p. 20, n. 6.  However, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey,* 125 F.3d 989, 995–96 (6th Cir. 1997) (internal citations omitted). Thus, any argument that ALJ erred at Step Three regarding Listing 12.04 is deemed waived. To the extent not waived, as discussed below, Corbin's argument that the ALJ was required to adopt the opinions of Drs. Wax and Flynn is without merit.

p. 12 (citing 20 C.F.R. § 404.1527(d)(1)).  Third, the Commissioner argues that, even though the

ALJ did not specifically discuss the weight assigned to Dr. Bina's December 9, 2008, opinion,

the ALJ did not ignore it or Dr. Bina's examination findings.  Doc. 16, pp. 12-13.  Additionally,

the Commissioner asserts that a review of the ALJ's decision as a whole demonstrates that the

ALJ impliedly rejected Dr. Bina's opinion that Corbin was disabled because it was inconsistent

with the medical evidence, including Dr. Bina's own examination findings.  Doc. 16, pp. 12-13.

     In response to Corbin's second and third arguments, the Commissioner asserts that, in

finding that Corbin did not have a severe mental impairment, the ALJ did not err in her

consideration of the opinions of state agency consultative physician Dr. Wax and state agency

reviewing physician Dr. Flynn.  Doc. 16, pp. 13-16.  Also, the Commissioner argues that the ALJ

properly considered that Corbin's mental health symptoms were a short-term side effect caused

by his hepatitis C Interferon treatment and did not last for 12 months.  Doc. 16, pp. 13-16.

     In response to Corbin's fourth argument, the Commissioner asserts that the ALJ

identified Listing 11.14 at Step Three and that, by analyzing evidence relating to Corbin's

polyneuropathy later in her decision, the ALJ provided sufficient articulation of her Step Three

finding.  Doc. 16, pp. 16-19.  Additionally, the Commissioner argues that the evidence itself does

not demonstrate that Corbin's polyneuropathy met or equaled Listing 11.14.  Doc. 16, p. 19.

## VI. Law & Analysis

     A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 19*89*).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 19*84*).

**A.**     **The ALJ's treatment of treating physician Dr. Pouya Bina was proper.**

Plaintiff argues that the ALJ erred by not discussing or assigning weight to treating physician Dr. Bina's December 9, 2008, opinion, which Plaintiff asserts was an "opinion that Corbin's chronic neuropathic pain renders him incapable of working at SGA levels."  Doc. 15, p. 12.  Dr. Bina was a treating physician, and under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 20*04*) (citing 20 C.F.R. § 404.1527(d)(2)) (internal quotations omitted).  However, for the reasons set forth below, Plaintiff's treating physician argument is without merit.

First, Dr. Bina's December 9, 2008, letter did not pertain to Corbin's ability to work at SGA levels.  Tr. 608.  Rather, Dr. Bina provided the December 9, 2008, letter at Corbin's request as support for his effort to obtain child care benefits and stated therein that Corbin "continues to suffer from chronic and disabling pain which renders him unable to care for Mark Beaty." Tr. 608, 610.  Since the December 9, 2008, letter is not related to Corbin's ability to work, Plaintiff's argument that Dr. Bina's December 9, 2008, letter was an opinion that he was incapable of working at SGA levels and therefore entitled to controlling weight is unpersuasive.

Second, even if Dr. Bina's December 9, 2008, letter was deemed to be an opinion that Corbin was disabled and unable to work, such an opinion relates to a determination reserved to

the Commissioner, i.e., whether Corbin is disabled and entitled to social security benefits.  Soc.

Sec. Rule No. 96-5p, 1996 WL 374183, * 2 (Soc. Sec. Admin. July 2, 1996).  Thus, such an

opinion, even when offered by a treating source, is not entitled to controlling weight or given

special significance. *Id.*

Third, notwithstanding the fact that Dr. Bina's December 9, 2008, opinion was not

entitled to controlling weight, the ALJ clearly evaluated Corbins's allegations of disabling lower

extremity pain and neuropathy and in doing so considered Dr. Bina's December 9, 2008, letter

(Tr. 21) and also discussed and considered Dr. Bina's treatment records, including the May 13,

2008, treatment notes wherein Dr. Bina noted that Corbin was able to walk for three to five

hours[14] and had shown "dramatic improvement" since his first visit (Tr. 19-20, referencing Tr.

542).  The ALJ also noted that Dr. Bina's December 9, 2008, examination of Corbin showed

normal range of movement, with 5/5 strength in upper extremities; lower extremities showed

palpable pulses but were tender to touch, with normal range of movement in hips and ankles but

limited in toes.  Tr. 20, referencing Tr. 610.  Additionally, the ALJ considered treatment records

from other physicians.  Tr. 20.  For example, the ALJ noted and considered that, on February 17,

2010, neurologist Joseph P. Hanna, M.D., indicated that the pain level in Corbin's feet was a

5/10, lower extremity reflexes were absent, 5/5 motor strength, no drift and a normal gait.  Tr.

20, referencing Tr. 645-48.   After discussing the various medical evidence and findings relative

to lower extremity pain and neuropathy, the ALJ concluded that "these medical findings, signs,

and symptoms are not consistent with the severity of the impairments alleged by the claimant."

Tr. 20.

---

[14] Dr. Bina's notes also reflect that, if working, Corbin could maybe walk 30 minutes to 2 hours but would have to stop to take off his shoes to rest.  Tr. 542.

Based on the ALJ's discussion and review of the medical evidence, it can be inferred that the ALJ concluded that Dr. Bina's December 9, 2008, letter, which suggested total disability based on lower extremity neuropathy, was inconsistent with or unsupported by Dr. Bina's treatment records and/or other medical records.  Thus, the ALJ's failure to specifically state that he rejected Dr. Bina's opinion, which suggested that Corbin was under a total disability, was not error.  *See Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx. 462, at 472 (6th Cir. 2006) (while noting that it was a rare case of an ALJ's analysis meeting the goal of the treating physician rule if not the letter of that rule, the court found that the ALJ's analysis of the claimant's impairments adequately addressed the opinions of the treating physicians by indirectly attacking the consistency of those opinions with other record evidence and the supportability of those opinions and implicitly provided sufficient reasons for not providing those opinions controlling weight).

Plaintiff argues that the ALJ picked only the evidence that supported her decision and therefore it cannot be said that the ALJ impliedly rejected or indirectly attacked Dr. Bina's opinion.  Doc. 17, p. 3  For example, Plaintiff argues that, when discussing the December 9, 2008, treatment notes, the ALJ excluded abnormal findings, including the note that Corbin "continues to have chronic pain in both feet with limited ambulation" notwithstanding Neurontin treatment.  Doc. 17, p. 3 (referencing Tr. 610).[15]  While the ALJ does not specifically mention this portion of the December 9, 2008, treatment notes, that note is part of the "history of present illness" section, not part of the physical examination findings.  Tr. 610.  Further, the ALJ discussed the fact that Corbin "takes prescription Nuerontin to treat the lower extremity neuropathy, but he [Corbin] alleged that it does not have much effect."  Tr. 19.

Corbin's argument that the ALJ erred by focusing unduly on normal findings is unpersuasive.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) (indicating

---

[15] Plaintiff also takes issue with the ALJ's summary of Dr. Hanna's February 17, 2010, examination.  Doc. 17, p. 3.

that the so-called cherry picking of evidence by the ALJ "can be described more neutrally as weighing the evidence").  Further, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir.2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (citations omitted).

For the reasons set forth above, the ALJ did not err in her consideration of or treatment of Dr. Bina's December 9, 2008, letter or treatment records.

**B.      The ALJ did not err in her consideration of the opinions of state agency reviewing physician Dr. Catherine Flynn and did not err in her consideration of Plaintiff's mental impairment claim.**

Plaintiff initially argued that the ALJ erred because she failed to discuss the weight she gave to the opinions of Dr. Mitchell Wax and Dr. Catherine Flynn.  Doc. 15, p. 14.  However, in his Reply Brief, Plaintiff conceded that the ALJ had explained the weight assigned to Dr. Wax's and to Dr. Flynn's May 20, 2008, opinion and, Plaintiff clarified that he is challenging only the ALJ's treatment of Dr. Flynn's July 5, 2008, revised opinion.  Doc. 17, p. 4.  Plaintiff also contends that the ALJ erred in finding his psychological impairments to be non-severe at Step Two and by failing to account for psychological impairments in the RFC.  Doc. 15, pp. 16-17. As discussed below, Plaintiff's arguments are without merit.

In addressing Corbin's mental impairment claim, the ALJ did not disregard the opinion of Dr. Flynn.  Rather, the ALJ determined that neither the opinion of Dr. Wax (state agency consultative examiner) nor the opinion of Dr. Flynn (state agency reviewing consultant) were entitled to weight because neither had considered the psychological side effects that stemmed from Corbin's Interferon treatment for hepatitis C treatment during 2008.  Tr. 17-18.  In reaching

this conclusion, the ALJ did not specifically identify the May 20, 2008, opinion or the July 5, 2008, opinion.  However, the ALJ was aware that Dr. Flynn had issued a Mental RFC assessment in May of 2008 and that there were concerns raised regarding that report and suggestions made for further analysis.  Tr. 18 (referencing Tr. 506-07, case analysis regarding Dr. Flynn's Mental RFC assessment, which noted problems with Dr. Flynn's May 20, 2008, assessment).

The ALJ sufficiently explained that she was not providing weight to the state agency consultants' opinions because those physicians had not considered the fact that Corbin's depression was a side effect of his Interferon treatment.  Plaintiff has not demonstrated that the ALJ's explanation is not supported by the record.  Accordingly, Plaintiff's argument that the Commissioner's decision should be reversed and remanded because the ALJ failed to explain the weight provided to Dr. Flynn's July 5, 2008, assessment is without merit.  Moreover, even if the ALJ erred by failing to explain sufficiently her decision not to assign weight to Dr. Flynn's July 5, 2008, assessment, the error was harmless because that assessment contained no findings of significant mental impairments.[16]

In determining that Corbin's depression was not severe, the ALJ considered the fact that Corbin had not sought professional mental health treatment for depression and that, on September 10, 2008, when he was in the midst of his Interferon treatment he denied feelings, signs, or symptoms of mental depression.  Tr. 18, referencing Tr. 581.   Moreover, the ALJ considered the fact that Corbin's depression resulting from his Interferon treatment lasted less than 12 months.  Tr. 18.  These findings are supported by the evidence.  Further, as discussed above, to the extent that Corbin relies upon the state agency physician opinion that included

_____

[16] Dr. Flynn concluded that Corbin "can process complex interactions.  He will do best with activities which minimixe [sic] prolonged social exposure such as his current reported activities with work on cars.  No other significant psych limitations documented."  Tr. 576.

diagnoses of depression, bipolar disorder, and intermittent explosive disorder to support his claim that his mental impairment was severe (Doc. 15, p. 17), the ALJ assigned no weight to those opinions and sufficiently explained her basis for assigning no weight.  Accordingly, Corbin's claim that the ALJ erred in finding his mental impairments to be non-severe is without merit.

Further, Corbin's argument that the ALJ erred by not accounting in the RFC for non-exertional limitations based on his mental impairments is also without merit.  The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§ 404.1545(a)(3), 404.1546(c), 404.1527; *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC."); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding").

Moreover, contrary to Corbin's argument, when assessing Corbin's RFC, the ALJ did consider his claim that he experienced severe psychological symptoms.  Tr. 19.  However, the ALJ found Corbin's statements regarding the severity of his symptoms not credible to the extent those symptoms were inconsistent with the RFC.  Tr. 18-21.  For example, the ALJ noted that Corbin had not alleged depression until the reconsideration level.  Tr. 20.  Further, while giving weight to Dr. Mullen's January 24, 2008, opinion that Corbin was undergoing major medical therapy with devastating side effects, the ALJ considered the fact that that treatment lasted less than 12 months and that there was no further medical opinion evidence from Dr. Mullen

suggesting that the disabling impairments persisted.  Tr. 21.   Since assessment of Corbin's RFC

is an issue reserved to the ALJ, and because the ALJ did consider Corbin's alleged mental

impairments when assessing the RFC but found Corbin's allegations not sufficiently credible, the

ALJ did not err in her RFC assessment.   Accordingly, Corbin's request for reversal and remand

based on the ALJ's RFC assessment is also without merit.

**C.    The ALJ did not err in her Step Three analysis.**

Corbin argues that reversal and remand is warranted because the ALJ failed to conduct a

meaningful review of Corbin's polyneuropathy in relation to Listing 11.14 – *Peripheral*

*Neuropathies*.  Doc. 15, pp. 18-21.  Listing 11.14 requires a showing of peripheral neuropathies

"with disorganization of motor function as described in section 11.04B, in spite of prescribed

treatment." 20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 11.14.  Section 11.04B describes

disorganization of motor function as "[s]ignificant and persistent disorganization of motor

function in two extremities, resulting in sustained disturbance of gross and dexterous

movements, or gait and station (see 11.00C).  20 C.F.R. pt. 404, Subpt. P, App. 1, Listing

11.04B.

"[I]t is the claimant's burden to show that he meets or medically equals an impairment in

the Listings." *Todd v. Astrue*, 2012 WL 2576435, * 9 (N.D. Ohio 2012) (internal citations

omitted), *report and recommendation adopted*, 2012 WL 2576282 (N.D. Ohio 2012).  Relying,

in part, on *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411 (6th Cir. 2011), Plaintiff asserts

that the ALJ erred at Step Three because the ALJ did not sufficiently articulate her Step Three

analysis under Listing 11.14.  Doc. 15, pp. 18-21.  In *Reynolds*, the ALJ made a conclusory

statement that the claimant's mental and physical impairments did not meet or equal a Listing

and proceeded to discuss, in detail, only the claimant's mental impairments, not the claimant's

physical impairments.  *Reynolds*, 424 Fed. Appx. at 415.  The Sixth Circuit ultimately

determined that the ALJ's Step Three evaluation was insufficient because an evaluation of the

evidence was necessary to facilitate meaningful judicial review.  *Id.* at 416, citing *Clifton v.

Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996); *see also Draper ex rel. R. O. v. Astrue*, 2012 WL

5385056, *8 (N.D. Ohio Oct. 12, 2012) (finding error where the ALJ did not even identify the

Listings he considered), *report and recommendation adopted*, 2012 WL 5385019 (N.D. Ohio

Oct. 31, 2012).

Here, at Step Three, the ALJ noted that she considered Listing 11.14 and concluded that

"[n]o treating physician has mentioned findings regarding the claimant's physical impairments

equivalent in severity to the criteria of any listed impairment, nor does the evidence show

medical findings that are the same or equivalent to those of any listed impairment of the Listing

of Impairments."  Tr. 18.   Although the ALJ did not discuss specific medical evidence relating

to Corbin's neuropathy in the Step Three section, the ALJ's decision as whole, including her

RFC analysis, provides sufficient analysis to determine that no reasonable administrative fact

finder would have resolved the matter differently.

For example, as part of her RFC analysis, the ALJ considered in detail evidence relating

to Corbin's hepatitis C with alleged foot and lower extremity pain and neuropathy and found

Corbin's allegations that his condition was disabling not fully credible.  Tr. 19-20.  The ALJ

considered an August 2006 normal foot radiograph (Tr. 393) as well as October 4, 2007, records

reflecting negative foot x-rays (Tr. 419).  Tr. 19.  The ALJ also noted that, on October 16, 2007,

Dr. Bina indicated that Corbin's pain and neuropathy were likely secondary to his hepatitis C and

could improve if his hepatitis was treated and prescribed Neurontin.  Tr. 19-20, referencing Tr.

424.  On December 11, 2007, during a follow-up visit with Dr. Bina, Corbin stated that the

Neurontin was working well; his pain was greatly improved with the Neurontin, with increasing weight bearing and reduced pain; and, although he could still feel the pain, it was dull rather than sharp.  Tr. 20, referencing Tr. 442, 521.   A number of months later, as reflected in the ALJ's decision, on May 13, 2008, Corbin reported doing much better with the Neurontin and he could walk for three to five hours.[17]  Tr. 20, referencing Tr. 542.  Dr. Bina noted that Corbin's progress reflected a "dramatic improvement" from his first visit.  Tr. 20, 542.  On September 22, 2008, three days after he stepped on a rusty nail while working in his yard, Corbin presented to the emergency room.  Tr. 20, referencing Tr. 630.   Corbin indicated that he had been wearing boots but 1.5 inches of the nail went through his foot.  Tr. 630.  As reflected in the ALJ's decision, Corbin reported that he removed the nail and was in pain but continued working.  Tr. 20, referencing Tr. 630.   The ALJ also considered Dr. Bina's December 9, 2008, examination findings (Tr. 610) and Dr. Hanna's February 17, 2010, examination findings (Tr. 645-47) but determined that those findings were not consistent with the severity of the impairments alleged by Corbin.  Tr. 20.

Although the ALJ did not include the above discussion in her Step Three section, it is clear that she considered Listing 11.14 (Tr. 18) and considered evidence relating to Corbin's alleged foot pain and neuropathy but concluded that the evidence did not support a finding of disability under Listing 11.14 (Tr. 19-20).  Thus, the undersigned finds that the ALJ's failure to specifically discuss the evidence relating to Corbin's neuropathy in the Step Three portion of her decision is harmless error.  *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005) (finding that *Clifton* did not categorically reject the application of harmless error analysis in the context of a Step Three finding); *see also Hufstetler v. Comm'r of Soc. Sec.*, 2011 WL 2461339,

---

[17] The May 13, 2008, treatment notes also reflect that Corbin indicated that, if he were working, he could maybe walk 30 minutes to 2 hours before having to stop and rest.  Tr. 542.

*10-11 (N.D. Ohio 2011) (applying harmless error where an ALJ did not specifically reference a claimant's medical condition when addressing the Listings but did so when analyzing the RFC); *see also Malone v. Comm'r of Soc. Sec.*, 2011 WL 5520292, *1-3 (N.D. Ohio 2011) (finding that, based on a review of the ALJ's decision as a whole, remand was not necessary even though the ALJ's decision contained only a conclusory statement at Step Three).

Moreover, a review of the foregoing evidence and the ALJ's discussion of that evidence demonstrates that the ALJ's decision that Corbin's condition did not rise to the level of "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C), 20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 11.04B, is supported by substantial evidence. Thus, the fact that the ALJ did not specifically include her analysis of the medical evidence as part of the Step Three portion of her decision is not a basis for reversal or remand.

To the extent that Corbin attempts to argue that there is evidence that establishes that his impairment meets or equals Listing 11.14 (Doc. 15, pp. 20-21), there is substantial evidence, as discussed above, to support the ALJ's finding that Corbin's impairments or combination of impairments do not satisfy Listing 11.14.  Thus, reversal is not warranted.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ," the Commissioner's decision cannot be overturned). Additionally, the ALJ considered and/or properly discounted evidence relied upon by Corbin to support his argument that the ALJ erred at Step Three.  For example, Plaintiff relies upon Dr. Bina's December 9, 2008, opinion letter.  Doc. 15, p. 20.  However, the ALJ considered that opinion (Tr. 21) and, as discussed above, that opinion is not relevant and/or it is related to an

issue reserved to the Commissioner and therefore was not entitled to controlling weight. Additionally, Corbin relies upon portions of medical findings contained in Dr. Bina's December 9, 2008, treatment notes and portions of medical findings contained in Dr. Hanna's February 17, 2010, treatment notes.  Doc. 15, p. 20.    However, as discussed above, the ALJ did consider those treatment records and found that Dr. Bina's and Dr. Hanna's medical findings, signs, and symptoms were not consistent with the severity of the impairments alleged by Corbin.  Tr. 20. Further, the ALJ considered Corbin's testimony about keeping a cot on the first floor of his home in the event his feet hurt too much to climb the stairs.[18] Tr. 19.    To the extent that Corbin relies on his alleged need to use a cane to show that his condition meets or equals Listing 11.14, Corbin testified that no physician prescribed a cane and that his cane is "not even a cane" but rather a stick that his grandson found for him.  Tr. 48.

As discussed herein, the ALJ's decision, as a whole, contains sufficient information and analysis to allow this Court to conduct a meaningful judicial review and to conclude that the ALJ's Step Three findings are supported by substantial evidence.  Thus, Plaintiff's request that this Court overturn the Commissioner's decision based on the ALJ's Step Three findings is unpersuasive and without merit.

---

[18] Also, by Corbin's own testimony, he usually eventually makes his way upstairs to bed. Tr. 36.

## VII. Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

Dated:  October 21, 2013

_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).